**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------------

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>       **Plaintiffs,**<br><br>  -against-<br><br>ALLBODY HEALING SUPPLIES LLC, DAVID TSATSANACHVILI, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>       **Defendants.** | **CIVIL ACTION**<br><br>**21-CV-3525 (EK)(JRC)**<br><br>**COMPLAINT**<br><br>**(TRIAL BY JURY DEMANDED)** |

--------------------------------------------------------------------------------

    Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (collectively "**Plaintiffs**" or "**Allstate**"), by their attorneys, Morrison Mahoney, LLP, for their Complaint against Defendants David Tsatsanachvili ("Tsatsanachvili"), Allbody Healing Supplies LLC ("Allbody Healing Supplies") (Tsatsanachvili and Allbody Healing Supplies are collectively referred to herein as the "Retail Defendants"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively referred to herein with the Retail Defendants as "**Defendants**") allege as follows:

<u>**PRELIMINARY STATEMENT**</u>

    1.  On information and belief, from November 2015, and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

    2.  This action seeks to recover more than $301,000.00 that Defendants stole from Plaintiffs through the submission of numerous false and/or fraudulent insurance claims for post-surgical rehabilitative durable medical equipment ("DME") devices, in particular, Continuous

Passive Motion ("CPM") machines and Cold Water Circulation Units also known as cold therapy units ("CTUs") (collectively "Rental DME").

3. At all relevant times mentioned herein, each and every piece of Rental DME supplied by Allbody Healing Supplies was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4. To execute the scheme to defraud alleged herein, Defendant Tsatsanachvili, through Allbody Healing Supplies, entered into separate arrangements with one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5. On information and belief, pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

(ii) fabricating and/or falsifying DME prescriptions by:

(a) utilizing blank prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME;

(b) duplicating and/or photocopying the HCPs' signatures onto new prescription forms, which the Clinic would then fill in with expensive and unnecessary DME; and/or

(c) fraudulently altering otherwise valid prescriptions issued by their HCPs by adding or changing the DME prescribed in order to conform the prescription to a pre-determined protocol designed to maximize reimbursement by insurance companies; and/or

(iii) ensuring that the prescriptions were sufficiently generic and/or formulaic so that the nature, quality and cost and medical necessity of any DME could not be verified based on the description of the prescribed item alone.

6.    The use of generic and/or formulaic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME prescribed and dispensed to the patient, if any items were legitimately prescribed and dispensed at all; (ii) misrepresent the medical necessity of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.    Pursuant to the fraudulent prescriptions, Allbody Healing Supplies routinely provided (or purported to provide) a nearly identical battery of Rental DME for the same and/or similar duration to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Claimants" or "No-fault Claimants"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.    On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.    On information and belief, in many instances, Tsatsanachvili submitted to Plaintiffs, through Allbody Healing Supplies, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent the quality and medical

necessity of Rental DME actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.    After obtaining the fraudulent prescriptions from the No-fault Clinics, Tsatsanachvili, through Allbody Healing Supplies, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the nature and quality of the items the amounts they were entitled to be reimbursed and/or the medical necessity of the purportedly prescribed DME.

11.    In carrying out the scheme to defraud, Defendants stole in excess of $301,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

12.    Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Claimants can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

13.    As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for DME that was never provided, not provided as billed or, if provided, was otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Claimants received substantially similar DME.  Exhibit "1" in the accompanying Compendium of

Exhibits is a representative sample of claims paid by one or more Plaintiffs to Allbody Healing Supplies for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

14. Defendant Allbody Healing Supplies is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for its services, Allbody Healing Supplies accepted (and continues to accept) assignments of benefits from Claimants and submitted (and continues to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

15. In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Allbody Healing Supplies submitted (and continues to submit) bills for its claims to Plaintiffs using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form.

16. At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Allbody Healing Supplies contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

17. At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

18.     At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service related expenses. In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

19.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Claimants under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

20.     Effective July 11, 2007, through all relevant times mentioned herein, the WCB established a fee schedule for DME and orthotic devices, which adopts the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"). 12 N.Y.C.R.R. § 442.2(a). The Fee Schedule was, and is, in effect at all relevant times mentioned herein.

21.     At all relevant times mentioned herein, with respect to items that are not on the Fee Schedule (hereinafter " Non-Fee Schedule" items ), the regulations further provide:

> [I]f the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

*Id.*

22.     Accordingly, at all relevant times mentioned herein, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule.  At all relevant times mentioned herein, for Non-Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a).

23.     At all relevant time mentioned herein, under the Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b).  Furthermore, at all relevant times mentioned herein, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery."  12 N.Y.C.R.R. § 442.2(c).

24.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

25.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the

"full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

26.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Tsatsanachvili, through Allbody Healing Supplies, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME. To the extent the DME was provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

27.     On information and belief, in furtherance of the scheme to defraud alleged herein, Defendants, as a matter of pattern, practice and protocol, routinely provided Claimants with expensive rental DME items that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

28.     On information and belief, as part of a fraudulent protocol of treatment, after receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or shoulder braces, many of the Claimants are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medical necessary. On the same day as the surgery, and within a few short days after the surgery, Allbody Healing Supplies, among others, delivers to the Claimants expensive rental devices that were not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration. In

many cases, the Claimants receive up to four or more such medically unnecessary items from rental DME providers, for up to 28 days or longer, in some cases exceeding $10,000.00 in a total cost for all of the items, as part of the scheme to financially enrich the rental DME providers, and Allbody Healing Supplies in particular, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Claimants were actually injured and in need of treatment.

29.     On information and belief, Allbody Healing Supplies was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

30.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any DME and/or orthotic devices at all, provided No-fault Claimants with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

31.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud— although that would be troubling enough—rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for DME pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost and medical necessity for the DME purportedly provided, was carried out for the purpose of committing fraud.

32.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits

reimbursement of No-fault benefits to legitimate insurance claims for DME. In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of the Retail Defendants' No-fault claims because the Defendants submitted (1) false and fraudulent insurance claims for medically unnecessary DME to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for DME the Defendants never actually supplied to No-fault Claimants. Such claims continue to be submitted by and/or in the name of the Allbody Healing Supplies and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

33. By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $200,400.00 in unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.

## NATURE OF THE ACTION

34. This action is brought pursuant to:

i) The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii) New York State common law; and

iii) the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

35. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from

Plaintiffs for DME they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

36.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of the Retail Defendants' unpaid No-fault claims because:

      i)      The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and

      ii)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

37.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $301,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME and/or orthotic devices that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

**A.     Plaintiffs**

38.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

39.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

40.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

41.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

42.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.     The Individual Defendant**

43.     David Tsatsanachvili ("Tsatsanachvili") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Allbody Healing Supplies LLC and, at all times relevant herein, operated, managed, and/or controlled its activities.

**C.     The Retailer Defendant**

44.     Allbody Healing Supplies LLC ("Allbody Healing Supplies") was incorporated on or about November 5, 2015, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 445 Central Avenue, Suite 356, Cedarhurst, NY 11516.  Allbody Healing Supplies is operated, managed, and/or controlled by Defendant Tsatsanachvili and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

**D.     The John Doe Defendants**

45.     On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

E.    **The ABC Corporations**

46.    On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme. These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

47.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

48.    This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

49.    This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

50.    Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

51.    Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

52.     Plaintiffs underwrite automobile insurance in New York State.

53.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

54.     On information and belief, Allbody Healing Supplies is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for their services, Allbody Healing Supplies accepts assignments of benefits from the Claimants covered under the No-fault Law and submits claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

55.     To process and verify the claims submitted by Allbody Healing Supplies, Plaintiffs required, and Allbody Healing Supplies submitted, prescriptions and other documents relating to the DME allegedly supplied to No-fault Claimants for which Allbody Healing Supplies was seeking reimbursement from Plaintiffs.

56.     In nearly all instances, the prescriptions submitted in support of Allbody Healing Supplies' claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

57.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process Allbody Healing Supplies' claims within 30 days of receipt of proof of claim.

58.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Allbody Healing Supplies in support of their

claims, and paid Allbody Healing Supplies based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

59.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).  At all relevant times mentioned herein, for DME and orthotic devices, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2.

60.     At all relevant time mentioned herein, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

(1)     the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

(2)     the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2.

61.     At all relevant time mentioned herein, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b).

62.     Furthermore, at all relevant times mentioned herein, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c).

63.     On information and belief, Allbody Healing Supplies was created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for DME that was never provided, was not provided as billed or, if provided, was otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all No-fault Claimants received the same or similar battery of DME.

64.     The DME that Allbody Healing Supplies purported to provide, and for which it billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, Tsatsanachvili, through Allbody Healing Supplies, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

65.     On information and belief, Tsatsanachvili created and controlled Allbody Healing Supplies, which was part of a well-organized illegal enterprise that engaged in a pervasive fraudulent practice that distinguished it from legitimate providers of DME.  The components of the enterprise followed practices that were part of a racketeering scheme dictated by Tsatsanachvili, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, Tsatsanachvili, through Allbody Healing Supplies, misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided to No-fault Claimants;

- Unlike legitimate retail DME companies, Tsatsanachvili, through Allbody Healing Supplies, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Tsatsanachvili, through Allbody Healing Supplies, submitted bills to Plaintiffs for DME that were never provided to No-fault Claimants;

- Unlike legitimate retail DME companies, Tsatsanachvili, through Allbody Healing Supplies, misrepresented the usual and customary price of the Non-fee Schedule items purportedly supplied to No-fault Claimants;

- Unlike legitimate retail DME companies, Tsatsanachvili, through Allbody Healing Supplies, submitted prescriptions, bills, and delivery receipts to Plaintiffs for DME that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided as well as the medical necessity for the items;

- Unlike legitimate retail DME companies, Tsatsanachvili, through Allbody Healing Supplies, concealed the fact that the DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Tsatsanachvili, through Allbody Healing Supplies, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were fabricated and/or fraudulently altered/duplicated in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, Tsatsanachvili, through Allbody Healing Supplies, and/or those acting under their direction and control, had agreements and/or understandings as to what DME would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Tsatsanachvili, through Allbody Healing Supplies, arranged to have prescriptions for DME delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers; and/or

- Unlike legitimate retail DME companies, Tsatsanachvili, through Allbody Healing Supplies, entered into illicit relationships with the No-fault Clinics which, in exchange for kickbacks and/or a fee, provided Allbody Healing Supplies with prescriptions and/or referrals for Rental

DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

66. In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Claimant.

67. The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises. By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Tsatsanachvili engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs prescribed large amounts of virtually identical DME to their patient population, and/or (ii) fabricate and/or fraudulently alter/duplicate prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Allbody Healing Supplies, numerous fraudulent claim forms seeking payment for DME that were purportedly (but not actually) provided to many Claimants;

- Submitted or caused to be submitted, on behalf of Allbody Healing Supplies, prescription forms in support of requests for payment for DME, which they knew to be fabricated and/or fraudulently altered/duplicated;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

68. At all relevant times mentioned herein, Tsatsanachvili knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME.

69.     At all relevant times mentioned herein, Tsatsanachvili , through Allbody Healing Supplies, directly or through others acting under and pursuant to their direction, instruction and control, submitted or caused to be submitted the fraudulent prescription and claim forms in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

70.     At all relevant times mentioned herein, Tsatsanachvili and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

71.     On information and belief, beginning in November 2015 and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Rental DME to No-fault Claimants.

72.     Tsatsanachvili incorporated, owned and/or controlled Allbody Healing Supplies for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

73.     On information and belief, Allbody Healing Supplies, through  Tsatsanachvili, engaged in a pervasive  scheme to defraud, wherein Tsatsanachvili: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Claimants on their behalf to ensure that they had all of the documents necessary to submit claims to insurers,

in general, and Plaintiffs, in particular; and (v) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for DME that were purportedly provided to Claimants based on medical necessity when, in fact, Tsatsanachvili, through Allbody Healing Supplies, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Claimant receiving a substantially similar Rental DME for a substantially similar timeframe regardless of medical necessity.

74.     Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive DME that was never provided, or if provided, was provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity materially misrepresented in their fraudulent bill submissions to Plaintiffs.

75.     Regardless of whether a No-fault Claimant was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a No-fault Claimant's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of DME, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary, including but not limited to prescriptions for rental DME.

76.     Such prescriptions are issued for virtually every No-fault Claimant, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

77.     As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with Allbody Healing Supplies, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Allbody Healing Supplies by: (i) causing their HCPs to write DME prescriptions in accordance with a pre-determined protocol; and/or (ii) fabricating and/or falsifying DME prescriptions by photocopying or duplicating the HCPs' signatures onto new, blank prescription forms, or altering the prescriptions, and filling in the prescription with expensive and unnecessary DME.

78.     In furtherance of the scheme to defraud alleged herein, the prescriptions for DME from the No-fault Clinics were forged by the managers, owners and/or controllers of the Clinic. By way of example and not limitation, Exhibits "3," "4," and "5" in the accompanying Compendium of Exhibits are affidavits executed by three physicians, Azu Ajudua, M.D. ("Ajudua") and Barry Dublin, M.D. ("Dublin") in connection with an action captioned *Government Employees Insurance Co. v. Champ Medical Supply, Inc.*, Docket No. 16-cv-04823 (NG)(SMG) (E.D.N.Y. Aug. 29, 2016), and Shaikh Ahmed, M.D. ("Ahmed"), in connection with an action captioned *Government Employees Insurance Co. v. Lenex Services,* Docket No. 16-cv-06030 (LDH)(CLP) (E.D.N.Y. Oct. 31, 2016) in which the physicians acknowledge that their signatures have been forged by  the No-fault Clinics that generate them.

79.     On information and belief, in furtherance of the scheme to defraud alleged herein, the use of multiple prescriptions bearing identical signatures is not an isolated incident unique to those non-parties involved in the affidavits, identified above.

80.     By way of example and not limitation, Exhibit "6" in the attached Compendium of Exhibits is a sample of prescription forms submitted by Defendant Allbody Healing Supplies, in support of claims for reimbursement to Plaintiffs in connection with Claimant J.G., Claim No.

0473921476-02, and Claimant V.F., Claim No. 0499337442-03, representative of prescriptions submitted by Allbody Healing Supplies in support of claims for reimbursement, wherein the HCP's signature appears to be duplicated and/or photocopied.

81.     In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the No-fault Claimants directly with the prescriptions for DME.  Instead, these prescriptions were given directly to Allbody Healing Supplies to eliminate the possibility that the No-fault Claimant(s) would fill the prescription(s) with a legitimate retailer of DME.

82.     Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the No-fault Claimants would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

83.     In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME in the same generic, non-descript manner as the prescriptions, and claim forms submitted by Allbody Healing Supplies in support of its claims for reimbursement.

84.     In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by Allbody Healing Supplies to Plaintiffs routinely misrepresented the DME provided.

85.     In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill submitted by Allbody Healing Supplies deliberately obscured all identifying information relating to the billed-for DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such DME or whether the specific DME and/or orthotic device was in fact medically necessary.

86.     Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## FRAUDULENT BILLING OF RENTAL DME ITEMS

87.     In furtherance of the scheme to defraud alleged herein, Allbody Healing Supplies, as a matter of pattern, practice and protocol, routinely provided Claimants with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

88.     On information and belief, as part of the scheme, the Claimants receiving the expensive rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly after the accident, the Claimants are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture and several pieces of DME and/or orthotic devices -- in some instances, receiving up to ten (10) to twelve (12) items.

89.     Months after the accident, as part of the fraudulent protocol of treatment, many of the Claimants are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

90.     On the same day as the surgery, and within a few short days after the surgery, the Claimants are prescribed expensive rental DME and/or compression devices, as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration. In many cases, the Claimants receive at least four or more such items, for up to 28 days or longer, in some cases exceeding $10,000.00 in total cost for all of the items. By way of example and not limitation, the following Claimants received the same or similar battery of rental DME and/or compression devices:

- In connection with claims submitted on behalf of claimant EL, claim number 0520275538-01, Plaintiffs were billed for at least five pieces of rental DME and/or compression devices and related appliances provided by three different companies, amounting to $5,262.95. On September 9, 2019, MiiSupply (not named as a defendant in the Complaint) billed Plaintiffs for a VenaFlow elite system with cuffs in the amount of $967.97. On September 11, 2019, Defendant Allbody Healing Supplies billed Plaintiffs for a knee CPM in the amount of $1,574.29 rented for a twenty-one day period and a sheepskin in the amount of $19.50. On November 29, 2019, Trinity Bracing, Inc. (not named as a defendant in the Complaint) billed Plaintiffs for a cold compression /DVT devices in the amount of $755.00 rented for a ten day period and a nonsegmental pneumatic appliance with pneumatic compression in the amount of $89.56. Trinity Bracing billed Plaintiffs on December 9, 2019 for a cold compression device in the amount of $750.00 and on December 19, 2019 for a cold compression/DVT device in the amount of $604.00 rented for an eight day period.

- In connection with claims submitted on behalf of claimant DB, claim number 0396510331-02, Plaintiffs were billed for at least ten pieces of rental DME and/or compression devices and related appliances by two different companies, amounting to $11,482.94. On February 11, 2016, MiiSupply, LLC (not named as a defendant in the Complaint) purportedly provided a DVTCare device with cuffs in the amount of $967.97. On February 12, 2016, Allbody Healing Supplies purportedly provided a water circulating pump in the amount of $1,049.79, rented for a twenty-one day period, a pad for the water circulating pump in the amount of $34.22, a knee CPM in the amount of $3,570.00, rented for a forty-two day period, a sheepskin in the amount of $19.50, and $99.99 in fees for DME servicing, parts repairs. On April 7, 2016, MiiSupply, LLC (purportedly provided a VenaFlow Elite System with cuffs in the amount of $967.97. On April 16, 2016, Allbody Healing Supplies LLC purportedly provided a water circulating pump in the amount of $1,049.79, rented for a twenty-one day period, a pad for the water circulating pump in the amount of $34.22, a knee CPM in the amount of $3,570.00, rented for a forty-two day

period, a sheepskin in the amount of $19.50, and $99.99 in fees for DME servicing, parts repairs.

- In connection with claims submitted on behalf of claimant RS, claim number 0492732714-02, Plaintiffs were billed for at least seven pieces of rental DME and/or compression devices and related appliances by two different companies, amount to $8,304.69. On March 30, 2018, Allbody Healing Supplies LLC purportedly provided a water circulating pump in the amount of $699.86, rented for a fourteen day period, a pad for the water circulating pump in the amount of $71.25, a knee CPM in the amount of $2,099.72, rented for a twenty-eight day period, and a sheepskin in the amount of $19.50. On April 6, 2018, MiiSupply LLC purportedly provided a SAM recovery system controller in the amount of $2,942.80, SAM coupling patches with gel in the amount of $574.00, and an SCR system control unit with wrap in the amount of $1,897.56, each rented for a twenty-eight day period.

91.     On information and belief, such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Retail Defendants. In that regard, the supply of such items was motivated by money, without regard to the actual need of the patients, for the express purpose if increasing the amount of reimbursement sought from insures in general, and Plaintiffs in particular.

1.     **Fraudulent billing of Continuous Passive Motion machines**

92.     In furtherance of the scheme to defraud alleged herein, Tsatsanachvili, through Allbody Healing Supplies, routinely submitted bills to Plaintiffs for Continuous Passive Motion ("CPM") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

93.     On information and belief, as a matter of pattern, practice and protocol, Tsatsanachvili, through Allbody Healing Supplies, submitted to Plaintiffs prescription forms which they knew or should have known to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent that CPM devices were medically necessary, when in fact, the

CPM devices were provided, if at all, to financially enrich Tsatsanachvili through a fraudulent protocol of treatment.

94. On information and belief, CPM is a modality of post-surgical treatment in which joint motion is provided by a machine without active contraction of muscle groups. A CPM device allows passive movement to be performed to a joint for hours at a time. The theory behind CPM is that recovery will be accelerated by decreasing soft tissue stiffness, increasing range of motion and promoting healing of joint surfaces in soft tissues, and preventing the development of adhesions. A typical CPM device consists of a carriage for support of the extremity and a controller that is programmed to passively flex and extend the joint through a set range of motion, speed, pause and duration.

95. On information and belief, CPM devices have no medical utility in limited post-operative circumstances, such as total knee replacements, and other knee indications including rehabilitation following repair of an anterior cruciate ligament prior to active physical therapy.

96. On information and belief, CPM is not medically useful as a treatment following basic arthroscopic surgical procedures, does not provide any long-term benefit to post-operative management of patients, is no more effective than standard physical therapy and is not supported by the medical literature:

- A systematic review of rehabilitation methods after arthroscopic rotator cuff repair was done by Anthony Yi, et al., and published in the journal *Sports Health* in 2015 (7:326-334) which concluded that it is unknown whether CPM offers any benefit after shoulder surgery. In addition, research has shown that CPM does not have any advantage for patients having knee surgery. For example, in patients having a total knee replacement, the American Association of Orthopedic Surgery (AAOS) has a Guideline that states: "Strong evidence supports that CPM after knee arthroplasty does not improve outcomes."

- A Cochrane Review was published that involved an analysis of multiple articles, and their conclusion was: *CPM does not have clinically important effects on active knee flexion ROM, pain, function or quality of life to justify its routine use.* In

addition, in a study by Herbold, et al., a matched cohort of patients with total knee replacement were compared, and their conclusion was: *The outcome variables of 61 matched pairs of CPM users and non-CPM users were reported. No statistically significant differences were found in any of the outcomes.*

- A study published in the July 1998 Journal of Bone and Joint Surgery comparing the results of 31 patient randomly assigned CPM therapy or manual passive range of motion exercises for post-operative management of rotator cuff repair, found no significant differences in Shoulder Pain and Disability index scoring for pain and functional disability of each group, and no significant differences between the two groups with regard to the range of motion or strength.

- A study published in the July 16, 2014 Journal of Bone and Joint Surgery comparing the results of 40 patients post treatment of intra-articular knee fractures around the knee, randomly assigned CPM or standardized physical therapy for 48 hours immediately following surgery found that CPM significantly improved knee flexion in the first 48 hours. However, there was no significant difference in knee pain at 48 hours, no other knee flexion or extension detected at any other time and no benefit of CPM in the immediate post-operative period with regard to knee motion at six months.

97. In addition to these studies, the Centers for Medicare and Medicaid Services ("CMS") issued a National Coverage Determination concluding that CPMs are only necessary after total knee arthroplasty, anterior cruciate ligament repair or reconstruction, after cartilage grafting procedures during the non-weight-bearing period to promote healing, and surgical release of arthrofibrosis of any joint.

98. CMS also stated that CPMs should be provided within 48 hours after surgery and that there is insufficient evidence to justify the use of CPMs beyond 21 days.

99. Notwithstanding that CPM devices are not medically useful as a treatment following routine knee and shoulder arthroscopic surgical procedures such as those performed on Claimants, Tsatsanachvili, through Allbody Healing Supplies, and pursuant to illicit kickback agreements with the HCPs, filled needless prescriptions for CPM devices to Claimants who purportedly underwent such procedures.

100.    Notwithstanding the lack of medical literature supporting the use and/or provision of CPM devices for patients that undergo routine arthroscopic procedures, as a matter of pattern, practice and protocol, such devices were routinely prescribed to Claimants and supplied by Allbody Healing Supplies pursuant to a pre-determined protocol of treatment and fraudulent scheme to maximize reimbursement.

101.    On information and belief, despite the fact that CPMs are not medically necessary for the injuries suffered by most, if not all the Claimants, and the lack of sufficient evidence to justify their use beyond 21 days, Allbody Healing Supplies routinely filled prescriptions systematically provided by the HCPs for CPMs to be used for anywhere between 4 and 8 weeks.

102.    On information and belief, although CPM units can be purchased from legitimate companies for less than Allbody Healing Supplies' accumulated monthly charges for the particular items, Allbody Healing Supplies systematically represents that the inexpensive CPMs dispensed to Claimants are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

103.    Specifically, Tsatsanachvili, through Allbody Healing Supplies, routinely submitted bills to Plaintiffs for the rental of CPM devices for use on joints other than the knee at rates ranging from $49.99 to $134.99 per day per patient, using billing code E0936 resulting in total charges in amounts ranging from $1,275.00 to $7,140.00 per patient.

104.    In addition, Tsatsanachvili, through Allbody Healing Supplies, routinely submitted bills to Plaintiffs for the rental of CPM devices for use on the knee at rates ranging from $74.99 to $85.00 per day, using billing code E0935 resulting in total charges in amounts ranging from $1,574.79 to $3,570.00 per patient. Exhibit "7" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims wherein Allbody

Healing Supplies submitted fraudulent bills for the rental of CPM Devices to one or more Plaintiffs using billing codes E0935 and/or E0936.

105.    On information and belief, notwithstanding that the Medicare rate for a CPM is only $21.50 per day, the charges by Allbody Healing Supplies far exceed that rate and are grossly inflated in order to maximize their reimbursement in furtherance of the scheme to defraud.

**2.    Fraudulent billing of Cold Water Circulation Units**

106.    In furtherance of the scheme to defraud alleged herein, Tsatsanachvili, through Allbody Healing Supplies, submitted bills to Plaintiffs for Cold Water Circulation Units also known as cold therapy units ("CTUs") that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

107.    On information and belief, CTUs combine cold temperatures and compression to decrease pain, discomfort, bleeding, swelling, use of medication, length of hospital stay and/or length of recovery following injury or surgery to an extremity. The theory behind cold therapy is that by decreasing the temperature of the tissue, which produces vasoconstriction, pain is lessened, muscle spasm is decreased and inflammation is reduced.

108.    CTUs utilize pneumatic or mechanical pumps that may be battery or electrically operated, and the intended function of the pump is to provide cyclical compression and cooling to the affected area. The purpose of the compression is to remove fluid and decrease edema while providing the cooling. The devices generally consist of two basic parts: a wrap or wrap system designed to cover specific areas of the body, and a control unit or pump, which is filled with ice and/or water. The control unit or pump circulates the cooled water through the wrap system to the affected area

109.     On information and belief, CTUs have been found to be useful for post-operative care of joint reconstruction surgeries in the 3-4 days immediately following surgery.

110.     As a matter of pattern, practice and protocol, Tsatsanachvili, through Allbody Healing Supplies submitted to Plaintiffs, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent that CTUs were medically necessary, when in fact, the CTUs were provided, if at all, to financially enrich the Retail Owners through a fraudulent protocol of treatment.

111.     Specifically, notwithstanding that CTUs are only medically necessary, if at all useful, for post-operative care of joint reconstruction surgeries, Tsatsanachvili, through Allbody Healing Supplies, and pursuant to illicit kickback agreements with the HCPs, routinely issued prescriptions for CTUs for patients that underwent basic joint procedures and/or did not have any surgery whatsoever.

112.     On information and belief, while CTUs are dispensed to reduce pain, swelling and inflammation, numerous studies have concluded that they are no more effective than standard ice therapy including the application of ice packs and compression.

113.     For instance, in a study published in the January 2008 Journal of Knee Surgery, the researchers compared postoperative pain control after knee arthroscopy in 53 patients with use of a CTU device compared with a traditional ice therapy regimen, and found that though pain intensity was similar between groups throughout the course of the study, there were no significant differences found in the groups regarding functional ability.

114.     In addition, in a systematic review of the literature concerning the use of cryotherapy in acute soft tissue injury published in the July 2001 edition of the International Journal of Sports Medicine, the review concluded that the optimal method of ice application is

wet ice applied directly to the skin through a wet towel and that the target temperature reduction is to 10-15 °C.

115.     Furthermore, in a study following 110 patients to assess the effectiveness of postoperative cold therapy after ACL reconstructions, published in the September-October 1996 American Journal of Sports Medicine, the review concluded that ice bags and cooling pads appeared equally effective.

116.     In addition to these studies, on June 9, 2019, the Center for Medicare and Medicaid Studies ("CMS") issued a Local Coverage Determination—No. L33735—in which it concluded that active cold therapy units were not medically necessary due to the availability of alternate therapy, such as traditional cold-pack application, which produce the same therapeutic outcome.

117.     On information and belief, even when CTUs are medically useful, they should be used for no more than three to four days immediately following surgery.

118.     Despite the fact that CTUs are not medically necessary, the Defendant Retailers routinely filled prescriptions systematically provided by the HCPs for the devices to be used for anywhere between two (2) and four (4) weeks.

119.     On information and belief, Allbody Healing Supplies obtained these prescriptions pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between themselves and the No-fault Clinics at which the HCPs were employed.

120.     Although the CTUs can be purchased from legitimate companies for less than Allbody Healing Supplies' accumulated monthly charges for the particular items, Allbody Healing Supplies systematically represents that the inexpensive CTUs dispensed to Claimants

are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

121.    Specifically, Tsatsanachvili, through Allbody Healing Supplies, routinely submitted bills to Plaintiffs for the rental of CTU devices at rates ranging from $49.00 to $49.99 per day per patient, using billing code E0236, resulting in total charges in amounts ranging from $699.86 to $2,049.59 per patient.  Exhibit "8" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims wherein Allbody Healing Supplies submitted fraudulent bills for the rental of CTU devices to one or more Plaintiffs.

## DISCOVERY OF THE FRAUD

122.    To induce Plaintiffs to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Tsatsanachvili, through Allbody Healing Supplies, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Tsatsanachvili, through Allbody Healing Supplies, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Tsatsanachvili, through Allbody Healing Supplies, knowingly misrepresented and concealed that Allbody Healing Supplies' claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Tsatsanachvili, through Allbody Healing Supplies, knowingly misrepresented and concealed that the prescriptions from the referring providers were fabrications and the doctors' signatures have been

duplicated and/or photocopied as part of the scheme to maximize reimbursement for medically unnecessary rental DME;

- Tsatsanachvili, through Allbody Healing Supplies, knowingly and deliberately concealed the amounts Allbody Healing Supplies was entitled to be reimbursed in the bills submitted to Plaintiffs by misrepresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the New York Medicaid Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

123.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $301,000.00 based upon the fraudulent bill submissions.

124.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS TSATSANACHVILI, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

## (RICO, pursuant to 18 U.S.C. § 1962(c))

125.    The allegations of paragraphs 1 through 124 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

126. At all times relevant herein, Allbody Healing Supplies was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

127. From, in or about November 5, 2015 through the date of the filing of this Complaint, Defendants Tsatsanachvili, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Allbody Healing Supplies enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

128. At all relevant times mentioned herein, Defendant Tsatsanachvili together with others unknown to Plaintiffs, exerted control over and directed the operations of the Allbody Healing Supplies enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent prescriptions.

129. On information and belief, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by prescribing DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the

Defendants, as well as bogus documentation, to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Tsatsanachvili required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims.

130.    On information and belief, it was both foreseeable and the intended consequence that the documents provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

131.    The racketeering acts set forth herein were carried out on a continued basis for more than a five year period, were related and similar and were committed as part of the ongoing scheme of Defendants Tsatsanachvili, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for DME to defraud insurers, and, if not stopped, such acts will continue into the future.

132.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Tsatsanachvili continues to pursue collection on the fraudulent billing to the present day.

133.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Tsatsanachvili with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud

Plaintiffs and to induce Plaintiffs to issue checks to the Allbody Healing Supplies enterprise based upon materially false and misleading information.

134.    Through the Allbody Healing Supplies enterprise, Defendant Tsatsanachvili submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants as billed. The bills and supporting documents that were sent by Defendant Tsatsanachvili, well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Tsatsanachvili, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Allbody Healing Supplies enterprise through the filing of this Complaint.

135.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Tsatsanachvili in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

136.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

137.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

138.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have

been damaged in the aggregate amount presently in excess of $298,500.00, the exact amount to be determined at trial.

139.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Tsatsanachvili, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS ALLBODY HEALING SUPPLIES AND TSATSANACHVILI

### (Common Law Fraud)

140.    The allegations of paragraphs 1 through 124 are hereby repeated and realleged as though fully set forth herein.

141.    Defendants Allbody Healing Supplies and Tsatsanachvili made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

142.    On information and belief, each and every bill and supporting documentation submitted by Defendants Allbody Healing Supplies and Tsatsanachvili to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

143.    On information and belief, Defendants Allbody Healing Supplies and Tsatsanachvili intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions and other documentation that contained false representations of material facts,

including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Allbody Healing Supplies was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the No-fault Claimants; and (b) that the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis did not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, and did not exceed the amount allowed under the Fee Schedule;

- False and misleading prescriptions for the DME purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Tsatsanachvili, through Allbody Healing Supplies, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME; (b) DME was not covered by the New York State Medicaid Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit Defendant Tsatsanachvili, through Allbody Healing Supplies, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

144.     The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Allbody Healing Supplies' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

145. Defendants Allbody Healing Supplies and Tsatsanachvili knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

146. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Allbody Healing Supplies and Tsatsanachvili.

147. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Allbody Healing Supplies' claims for No-fault insurance benefits submitted in connection therewith.

148. Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Allbody Healing Supplies and Tsatsanachvili evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

149. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $301,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS ALLBODY HEALING SUPPLIES AND TSATSANACHVILI

### (Unjust Enrichment)

150.     The allegations of paragraphs 1 through 124 are hereby repeated and realleged as though fully set forth herein.

151.     By reason of their wrongdoing, Defendants Allbody Healing Supplies and Tsatsanachvili have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

152.     Plaintiffs are therefore entitled to restitution from Defendants Allbody Healing Supplies and Tsatsanachvili in the amount by which they have been unjustly enriched.

153.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $301,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

## AGAINST ALL RETAIL DEFENDANTS

### (Declaratory Judgment under 28 U.S.C. § 2201)

154.     The allegations of paragraphs 1 through 124 are hereby repeated and realleged as though fully set forth herein.

155. At all relevant times mentioned herein, each and every bill mailed by the Retail Owners, through their respective Retailers, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and New York State Medicaid Fee Schedule by materially misrepresenting the DME provided, if provided at all, as well as the cost and quality of the billed for DME.

156. To the extent the DME was provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

157. At all times relevant herein, the Retail Defendants exploited the No-fault Law and New York State Medicaid Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Claimants.

158. In view of the Retail Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills they have submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs;

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

159.     As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME purportedly supplied to No-fault Claimants and the amounts they were entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions, obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Retail Defendants' No-fault claims.

160.     Plaintiffs have no adequate remedy at law.

161.     The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)      Compensatory damages in an amount in excess of $301,000.00 the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)     Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)     Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)    Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (ii) the Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)   Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.


Dated: New York, New York,
       July 13, 2021


                              Morrison Mahoney LLP


                              By:____/s/ Lee Pinzow_____
                                   Robert A. Stern, Esq.
                                   Daniel S. Marvin, Esq.
                                   James McKenney, Esq.
                                   Lee Pinzow, Esq.
                                   Attorneys for Plaintiffs
                                   Wall Street Plaza
                                   88 Pine Street, Suite 1900
                                   New York, New York 10005
                                   (212) 825-1212

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------------

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, | X ) ) ) |
| Plaintiffs, | ) ) |
| -against- | ) ) |
| ALLBODY HEALING SUPPLIES LLC, DAVID TSATSANACHVILI, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5, | ) ) ) |
| Defendants. | ) ) |
| | X |

CIVIL ACTION

21-CV-3525
(EK)(JRC)

COMPLAINT

(TRIAL BY JURY
DEMANDED)

--------------------------------------------------------------------------------

## COMPLAINT

**MORRISON MAHONEY, LLP**
**ATTORNEYS FOR PLAINTIFFS**
**WALL STREET PLAZA**
**88 PINE STREET, SUITE 1900**
**NEW YORK, NEW YORK 10005**
**TELEPHONE: (212) 825-1212**